ROY H. KNIBB, petitioner-appellant,

*v.*

MODESTA H. KNIBB, defendant-respondent.

[Submitted March term, 1923. Decided June term, 1923.]

1. It is not a good defence to an action for divorce on·the ground ·of desertion 'that the reason why the deserter persists in the desertion is that the petitioner, who was married to the defendant by a civil magistrate, refused to go through another marriage ceremony according to the rites of the Roman Catholic Church, he being a Baptist and she a Roman Catholic.

2. Article 1, section 4 of the state constitution inhibiting the denial of a civil right to any person on account of his religious principles extends its inhibiting force to a decree denying to petitioner a divorce because he had refused to accede to his wife's demand for the performance of a remarriage by a priest of her church as a condition of her return to petitioner as his wife under their prior civil marriage.

3. The constitutional inhibitions concerning the passage of legislation, or the holding of public office based upon religious conditions and qualifications, extend their inhibitive force *ex proprio vigore* to the promulgation of public decrees by a state agency or a judicial tribunal.

On appeal from a decree of the court of chancery.

*Messrs. Heine, Bostwick & Bradner,* for the appellant.

The opinion of the court was delivered by

MINTURN, J.

When the parties to this suit were married on October 6th, 1919, in New York City, by a civil magistrate, the civil and moral necessity for the marriage was urgently apparent to both. For some time they had been engaged, and their indiscretion during that period made marriage at the call of defendant a matter of duty, upon the part of the petitioner. The marriage having been performed, the petitioner was ready to assume cohabitation and the domestic relations and the incidents which attend the relationship of husband and wife. But at that moment the father-in-law and not the mother-in-law intervened, as the *bete noir,* and declared to petitioner at the wedding meal: "You know that you are not to live with my daughter unless you agree to another marriage by our faith—by the Catholic faith." The defendant assented to that situation, and on more than one occasion during conversations with petitioner, in which he sought her for the purpose of inducing her with their child to assume her place as his wife in his household, she took the same stand. His witnesses testify to the same result as a sequence of their visits; and thus time ran its course for the statutory period, when the petitioner, feeling that he

should have either his wife or his liberty, filed this petition for divorce upon the ground of his wife's continued and obstinate desertion.

The learned advisory master advised against the decree, upon the ground of non-corroboration as well as upon the ground that the request of the defendant for a remarriage in her faith was not unreasonable.

Our examination of the case satisfies us that the essential jurisdictional facts are amply supported by the corroborative proof contained in the record. It is not essential under our cases that specific corroborating witnesses be produced to support the petitioner's allegations, for as was stated by Judge Vroom, speaking for this court in *Foote* v. *Foote, 71 N. J. Eq. 273:* It is sufficient "if the circumstances as shown by the expressions and conduct of the defendant, together with the letters of the parties, corroborate the testimony of complainant." The mental attitude of the defendant in support of the petitioner's contention is indicated by her letter to the petitioner, written about June 6th, 1921, and received by him at Roanoke, Virginia: "It will," she says, "take only a couple of minutes to be married by a priest. We won't have to be talking about religion." This admission would seem *per se* to be sufficiently corroborative of the truth of the petitioner's insistence that a religious chasm only separated them from the marital duty of cohabitation. This admission is fortified by two visits made to defendant by the petitioner's friend, Mr. Bradner, who saw her in the autumn of 1921. The father, as on the marriage day, again intervened and maintained his original attitude that this daughter could not live with petitioner without the performance of the religious ceremony of her church. If this testimony were in conflict with the defendant's consistent attitude, as expressed in her letter, and expressed again upon a later visit by Mr. Bradner when he saw defendant's father, it might be properly treated as hearsay and not legally corroborative. But upon a subsequent visit Mr. Bradner saw the defendant personally, and as a friend of her husband entreated her to assume her legal relationship as the petition-

er's wife in his own household. She, however, repeated her father's view of the situation, and insisted as a condition to compliance upon a marriage in accordance with her religious views. Throughout the record is the petitioner thus corroborated by the substantive and circumstantial testimony in the case. Nor can we overlook the fact, in this connection, that although the defendant was within easy access of the trial court, she was neither present nor represented by counsel, and while that fact *per se* does not supply the requisite jurisdictional proof, it may be noticed as a corroborating factor, however slight, where the substantive proofs presented lend credence to the correctness of the claim of the petitioner concerning the mental attitude of the defendant.

In such a situation, where it becomes manifest that entreaties and supplications will be of no avail, the duty imposed upon the husband of making consistent overtures to the wife to return to him is not a condition precedent to the institution of the suit. We dealt with that question in *Hall* v. *Hall, 60 N. J. Eq. 470,* where the present chief-justice, speaking for the court, said: "Where it is manifest from the circumstances under which the desertion took place, or from her temper and disposition, or from any other fact in the case, that honest efforts on the husband's part to terminate the separation would be unavailing, or if successful in bringing the desertion to an end, would be so only temporarily, the duty of making it does not exist."

One question only remains, and that probably the most important in the case. Does the duty imposed by law upon the husband, and to which we have referred, of seeking the wife and making reasonable overtures for her return cast upon him also the duty of acceding to demands by her which he cannot conscientiously fulfill?

The learned advisory master thought that the petitioner should have acceded to the wishes of the defendant, and submitted to the performance of the religious ceremony demanded by her, as *sine qua non* to her assumption of the duties of a wife. This conclusion involves the assumption that the petitioner's religious views and scruples were not

as important and sacred to him *in foro conscientiæ* as were those of the defendant to her. The relative religious importance of these views manifestly we cannot attempt to determine, since one's religious views are entirely a matter for the individual conscience, and not for the courts to pass upon, unless the views, reduced to action, are of such character as to contravene the law of the land. Indeed, the defendant recognizes this fundamental personal right when in her letter she frankly informs the petitioner: "If you do what your conscience tells you, you can't help but be happy, and the same with me." He was a Baptist by choice, and his early training and religious environment had fashioned his mind to believe only in the teachings and tenets of that communion. She was a Catholic, and to her from early training and environment her faith was the correct summation of all religious thought and ceremony. To him, as a dissenter from the early established church, marriage in essence was as under the Roman law, a civil contract, subject to all the vicissitudes and infirmities of a civil obligation, in which the fundamental maxim was a *concensus et non concubitas facit matrimonium.* To her, marriage was a contract plus a sacrament, which in its origin was a contract established by the founder of the Christian dispensation, the bond of which, in the absence of fundamental canonical defects, could be dissolved only by death.

According to the ordinances of her faith, no one but a duly ordained priest of the church could administer the sacrament to members of her communion, and hence her frequently expressed desire to have the contract of the civil law elevated religiously to the status of a sacrament by the only person capable of administering it, thus imposing upon both parties to the contract, *in foro conscientiæ,* an indissoluble union, terminable only by death.

The petitioner refused to accept this religious status, and being a free agent, religiously as well as civilly, no civil tribunal could compel him to accept it as a condition to granting him a decree of divorce, to which he was otherwise legally entitled. Such is the spirit of our law, and such

was the fundamental conception of civil and religious liberty, which, after the inane feuds and contentions of centuries in other lands, brought together our forefathers of all religious persuasions upon common ground, and consecrated this land and its institutions to the indestructible ideals of civil and religious liberty. So intensely vivid in the colonial period was the recollection of the sanguinary feuds, based upon religious differences in other lands in an endeavor to worship God, according to the dictates of one's conscience, that the constitutional compact of our national life, attested by the intelligent and patriotic resolve of the Puritan from New England, the Quaker from Pennsylvania and Delaware, the Dutch Reformer from New York, the Presbyterian from New Jersey, the Episcopalian from the Old Dominion, the Catholic from Maryland, and the Baptist from Rhode Island, contains this quondum radical basic provision as the touchstone of our legislation and the administration of our law: "No religious test shall be ever required as a qualification to any office of trust under the United States." (*Section 3.*)

Thus happily as a result of this fundamental conception of a free religious life upon this virgin soil, there arose from the wrecks of religious empires, from the interminable vitrolic conflicts of centuries of religious pogroms and persecutions, our present harmonious and cherished design of national existence, the idealic conception of Webster: "An indestructible union of indestructible States." *Esto perpetua.*

In pursuance of the power conferred upon it by the fifth article of the constitution, the congress shortly thereafter buttressed that keystone of the constitutional arch by providing in the first amendment to the basic law that "congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof.*"

Our state constitution shortly thereafter, guided by the inspiring influence, provided: "No person shall be deprived of the inestimable privilege of worshipping Almighty God, *in a manner agreeable to the dictates of his own conscience,*

*nor under any pretence whatever be compelled to attend any place of worship contrary to his faith and judgment."* (*Article 1, section 3.*) "There shall be no establishment of one religious sect in preference to another; no religious test shall be required as a qualification for any office or public trust; and *no person shall be denied the enjoyment of any civil right merely on account of his religious principles."* (*Section 4.*) Manifestly the spirit of our law, upon this important subject, could not be more adequately, emphatically or frankly expressed.

Commenting upon this phase of our constitutional life, Professor Cooley appropriately observes: "Persons of every religious persuasion should be made equal before the law, and questions of religious belief and religious worship should be questions between each individual man and his Maker. Of these questions, human tribunals, so long as the public order is not disturbed, are not to take cognizance, except as the individual by his voluntary action in associating himself with a religious organization may have conferred upon such organizations a jurisdiction over him in ecclesiastical matters." *Const. Lim.* 659.

Manifestly, therefore, a judicial provision, or requirement, which would make the promulgation of a decree of divorce, to which the petitioner is entitled, as a "civil right," conditioned upon his consent to supplement the legally recognized civil contract by a religious ceremonial marriage, according to the rubrics of a church of which he is not a member, and whose religious tenets he is conscientiously unwilling to accept, is tantamount to the denial of due process of law, as well as in contravention of the constitutional inhibition which insures to him the protection of his "civil rights," regardless of his "religious principles."

Quite obviously, therefore, the constitutional inhibitions forbidding legislation and official tenures to be based upon religious qualifications and conditions extend *ex proprio vigore* their beneficent and all pervading potency to the decrees of a state agency or judicial tribunal, which would in-

48

voke a similar condition or qualification, as a basis for administrative or judicial action.

The decree appealed from will, therefore, be reversed, and the prayer of the petitioner will be granted.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, ACKERSON, VAN BUSKIRK—12.